AUTUMN M. ELLIOTT (Cal. Bar No. 230043)
autumn.elliott@disabilityrightsca.org
SRIVIDYA PANCHALAM (Cal. Bar No. 265398)
sri.panchalam@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
350 South Bixel Street, Suite 290
Los Angeles, CA  90017
Telephone: (213) 213-8000
Fax: (213) 213-8001

AARON J. FISCHER (Cal. Bar No. 247391)
aaron.fischer@disabilityrightsca.org
JULIE WILENSKY (Cal. Bar No. 271765)
julie.wilensky@disabilityrightsca.org
DISABILITY RIGHTS CALIFORNIA
1330 Broadway, Suite 500
Oakland, CA  94612
Telephone: (510) 267-1200
Fax: (510) 267-1201

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES ANTHONY GUERRA, CHRYSTAL, and KARLTON BONTRAGER,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>WEST LOS ANGELES COLLEGE and LOS ANGELES COMMUNITY COLLEGE DISTRICT,<br><br>　　　　Defendants. | Case No.: 2:16-cv-06796 MWF (KSx)<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date: October 17, 2016<br>Time: 10:00 a.m.<br>Courtroom: 1600<br>Judge: Hon. Michael W. Fitzgerald<br><br>Complaint Filed: Sept. 9, 2016 |

# Table of Contents

I.   INTRODUCTION ............................................................ 1

II.  STATEMENT OF FACTS ................................................. 3
    A.   WLAC'S CAMPUS IS INACCESSIBLE TO PLAINTIFFS ABSENT TRANSPORTATION ASSISTANCE .................................. 3
    B.   WLAC PREVIOUSLY OPERATED A SHUTTLE SERVICE THAT FACILITATED PROGRAM ACCESS TO INDIVIDUALS WITH DISABILITIES. ................................................................ 4
    C.   DEFENDANTS TERMINATED THE CAMPUS SHUTTLE SERVICE AND FAILED TO PROVIDE ALTERNATIVE ASSISTANCE TO ENSURE ADEQUATE CAMPUS ACCESSIBILITY FOR INDIVIDUALS WITH DISABILITIES. ...... 5
    D.   DEFENDANTS ARE DENYING PLAINTIFFS ACCESS TO CLASSES, ACADEMIC ACTIVITIES, AND OTHER CAMPUS SERVICES, EXCLUDING THEM FROM A NORMAL EDUCATIONAL EXPERIENCE AND PUTTING THEM AT RISK OF PHYSICAL INJURY EACH TIME THEY GO ON CAMPUS... 6
        1.   Charles Guerra .................................................... 6
        2.   Chrystal ............................................................. 9
        3.   Karlton Bontrager ............................................ 11
    E.   OTHERS HAVE ALSO INFORMED DEFENDANTS THAT THE TERMINATION OF SHUTTLE SERVICES DENIES ACCESS FOR STUDENTS AND OTHERS WITH DISABILITIES........................ 12

III. LEGAL STANDARD ................................................... 13

IV.  THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION ............ 14
    A.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. .... 14
        1.   Plaintiffs Will Prevail on Their Federal Law Claims. ...... 14
            a)   Defendants Have Violated the ADA and Section 504 by Excluding Plaintiffs from, and Denying Them Meaningful Access to, WLAC's College Programs.14
            b)   A Campus Shuttle Service Is a Reasonable and Effective Method of Ensuring Adequate Access for Plaintiffs. ................................................. 17
            c)   Defendants Have Failed to Offer Any Alternative

        Reasonable Modification that Ensures Adequate Access for Plaintiffs. .................................................. 20

    2.    Plaintiffs Will Prevail on Their State Law Claims. ..............................................................................22

    B.    PLAINTIFFS WILL BE IRREPARABLY HARMED IN THE ABSENCE OF PRELIMINARY RELIEF. ........................................ 22

    C.    BALANCE OF EQUITIES TIPS IN PLAINTIFFS' FAVOR. ........... 24

    D.    A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST. ........................................................................ 24

V.    THE COURT SHOULD NOT REQUIRE A BOND. ..................................... 25

VI.    CONCLUSION ............................................................................. 25

# Table of Authorities

Cases

*Alexander v. Choate*,
   469 U.S. 287 (1985) ............................................................ 16

*Alliance for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) .......................................... 14

*Armstrong v. Wilson*,
   124 F.3d 1019 (9th Cir. 1997) .......................................... 15

*Baracoa-Gomez v. Reno*,
   167 F.3d 1228 (9th Cir. 1999) .......................................... 25

*Baughman v. Walt Disney World Co.*,
   685 F.3d 1131 (9th Cir. 2012) .......................................... 22

*Chalk v. U.S. Dist. Court Cent. Dist. of California*,
   840 F.2d 701 (9th Cir. 1988) ............................................ 24

*Clear Channel Outdoor, Inc. v. City of Los Angeles*,
   340 F.3d 810 (9th Cir. 2003) ............................................ 14

*Cohen v. City of Culver City*,
   754 F.3d 690 (9th Cir. 2014) ............................................ 15

*Crowder v. Kitagawa*,
   81 F.3d 1480 (9th Cir. 1996) ........................... 15, 16, 17, 20

*D.K. ex rel. G.M. v. Solano Cnty. Office of Educ.*,
   667 F. Supp.2d 1184 (E.D. Cal. 2009) ............................. 22

*Disabled in Action v. Bd. of Elections in City of New York*,
   752 F.3d 189 (2d Cir. 2014) .............................................. 16

*Dopico v. Goldschmidt*,
   687 F.2d 644 (2d Cir. 1982) .............................................. 17

*Dunlap v. Ass'n of Bay Area Governments*,
   996 F. Supp. 962 (N.D. Cal. 1998) ............................. 17, 20

*Enyart v. Nat'l Conference of Bar Examiners, Inc.*,

   630 F.3d 1153 (9th Cir. 2011)........................................................ 23, 24

*Featherstone v. Pac. Nw. Univ. of Health Scis.*,

   No. 1:CV-14-3084-SMJ, 2014 WL 3640803 (E.D. Wash. July 22, 2014).......... 23

*Fortyune v. City of Lomita*,

   766 F.3d 1098 (9th Cir. 2014)............................................................. 15

*Chapman v. Pier 1 Imps. (U.S.) In*c,

   631 F.3d 93945 (9th Cir. 2011)........................................................... 15

*Galusha v. New York State Dep't of Envtl. Conservation*,

   27 F. Supp. 2d 117 (N.D.N.Y. 1998) .................................................... 20

*Henrietta D. v. Bloomberg*,

   331 F.3d 261 (2d Cir. 2003) ............................................................... 20

*Hernandez v. Cty. of Monterey*,

   110 F. Supp. 3d 929 (N.D. Cal. 2015) .......................................... 14, 25

*Hubbard v. SoBreck*,

   554 F.3d 742 (9th Cir. 2009)............................................................... 22

*Jorgensen v. Cassiday*,

   320 F.3d 906 (9th Cir. 2003) .............................................................. 25

*Leiva-Perez v. Holder*,

   640 F.3d 962 (9th Cir. 2011)............................................................... 13

*Lewis v. Casey*,

   518 U.S. 343 (1996) ......................................................................... 22

*PGA Tour, Inc. v. Martin*,

   532 U.S. 661 (2001) ......................................................................... 15

*Rodde v. Bonta*,

   357 F.3d 988 (9th Cir. 2004)......................................................... 14, 20

*Save Our Sonoran, Inc. v. Flowers*,

   408 F.3d 1113 (9th Cir. 2005)............................................................. 25

*Sullivan v. Vallejo City Unified Sch. Dist.*,

   731 F. Supp. 947 (E.D. Cal. 1990) ..................................................................... 22

*Tamara v. El Camino Hosp.*,

   964 F. Supp. 2d 1077 (N.D. Cal. 2013) ............................................................. 24

*Von Colln v. Cty. of Ventura*,

   189 F.R.D. 583 (C.D. Cal. 1999) ...................................................................... 23

*Winter v. Natural Resources Defense Council, Inc.*,

   555 U.S. 7 (2008) ............................................................................................. 13

*Y.G. v. Riverside Unified Sch. Dist.*,

   774 F. Supp. 2d 1055 (C.D. Cal. 2011) ............................................................. 22

*Communities Actively Living Indep. & Free v. City of Los Angeles* ............... 16, 17

Statutes

29 U.S.C. § 794 ......................................................................................................... 14

42 U.S.C. § 12101(a) .......................................................................................... 17, 24

42 U.S.C. § 12102(2)(A) .......................................................................................... 15

42 U.S.C. § 12131 .................................................................................................... 14

42 U.S.C. § 12132 .................................................................................................... 14

Cal. Civ. Code § 51 .................................................................................................. 22

Cal. Gov't Code § 11135 .......................................................................................... 22

Rules

Federal Rule of Civil Procedure 65(c) ..................................................................... 25

Regulations

28 C.F.R. § 35.130 .................................................................................................... 14

28 C.F.R. § 35.150(a) .......................................................................................... 17, 19

28 C.F.R. § 35.150(b) .................................................................................... 17, 19, 21

34 C.F.R. § 104.4 ...................................................................................................... 15

34 C.F.R. § 104.4(b) ................................................................................................. 22

Cal. Code Regs. tit. 5, § 56026 ................................................................................ 19

## I.     **INTRODUCTION**

Plaintiffs CHARLES ANTHONY GUERRA, CHRYSTAL (who uses one name as her legal name), and KARLTON BONTRAGER ("Plaintiffs") are community college students with mobility-related disabilities. These three students – a United States Army veteran, a woman returning to school after years serving as her mother's primary caregiver, and a part-time library volunteer – attend West Los Angeles College (WLAC). They are each working towards an Alcohol and Drug Studies certificate, which they plan to use to find work helping people overcome alcohol and drug abuse problems. Plaintiffs are deeply committed to completing their academic program, and to applying their education to work that allows them to give back to their community.

WLAC was built on a hill, and the campus is designed in such a way that individuals must traverse long distances with sloped and uneven paths in order to get from campus entrances and parking lots to classroom buildings, the library, the bookstore, meeting areas, student service offices, and other campus locations. As a result, in light of their mobility disabilities, Plaintiffs require transportation assistance to ensure meaningful access to their classes as well to student activities and programs on campus.

After years of operating a Campus Shuttle that prioritized serving individuals with disabilities who needed transportation assistance to get access classes and other services on campus, WLAC and the Los Angeles Community Colleges District (LACCD) ("Defendants") terminated this service in February 2016. Defendants told Plaintiffs and others with disabilities that they could use an on-call golf cart transport service instead, but then terminated the service the following month. Since March 2016, despite Plaintiffs' repeated requests for assistance and multiple in-person meetings with Defendants' representatives, Defendants have failed to provide transportation assistance or any alternative measures necessary to

1  provide Plaintiffs with meaningful access to the educational services and programs
2  offered on the WLAC campus.

3      While Defendants have all but ignored Plaintiffs' requests for access,
4  Plaintiffs have suffered serious harm. Mr. Guerra and Mr. Bontrager have both
5  fallen and injured themselves while trying to navigate WLAC's inaccessible
6  campus on their own. These falls have been humiliating and traumatic, and in Mr.
7  Guerra's case, resulted in the need for emergency medical care and in long-term
8  damage to his physical condition. Defendants' denial of access to campus services
9  has significantly restricted Plaintiffs' participation in college life and progress
10 towards completing their education. Plaintiffs have been forced to forgo classes,
11 withdraw from classes, and in Ms. Chrystal's case, limit summer 2016 coursework
12 to online classes, based on a real fear that they cannot safely navigate the campus
13 without the school's transportation service.

14     Defendants' proposed solutions to this problem have been as insulting as
15 they have been legally inadequate. For example, Defendants proposed that Mr.
16 Bontrager seek professors' permission to leave classes early or arrive late so that he
17 can have more time to get to the next class or student activity – essentially
18 suggesting that he miss out on instructional time rather than providing the
19 accommodation he needs to participate fully.

20     Defendants have violated and continue to violate Plaintiffs' right to
21 meaningful access to Defendants' programs, activities, and services under the
22 Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act of
23 1973, and state anti-discrimination law. The law requires Defendants to take
24 affirmative steps to ensure that students with disabilities have meaningful access to
25 the school's programs, services, and activities. Plaintiffs are being forced to delay
26 or forgo educational opportunities. And each day that they persevere by navigating
27 the campus, they are at significant risk of physical and other harm.

28

The transportation assistance Plaintiffs seek is reasonable. In fact, Defendants had long provided this very service – the Campus Shuttle – which explicitly prioritized individuals with disabilities and effectively met Plaintiffs' needs to ensure equal access. Defendants did so in conformance with the California Community Colleges Chancellor's Office (CCCCO)'s own guidelines, which explicitly envision the provision of on-campus tram services as a method of ensuring equal access on campuses that are large or have difficult terrain. LACCD's own disability access policy provides that its colleges may provide such services to ensure access for students with disabilities. Defendants nonetheless persist in denying this essential assistance.

Plaintiffs seek preliminary injunctive relief requiring Defendants to provide meaningful access to programs, services, and activities on the WLAC campus.

## II.  STATEMENT OF FACTS

### A. WLAC'S CAMPUS IS INACCESSIBLE TO PLAINTIFFS ABSENT TRANSPORTATION ASSISTANCE.

WLAC is a community college located in Culver City, California. It is one of nine colleges in the Los Angeles Community College District, the "largest community college district in the United States and one of the largest in the world." Decl. of Srividya Panchalam ("Panchalam Decl.") Ex. 2. WLAC serves approximately 12,000 students. *Id.* Ex. 4.

An accessible education for all is the central purpose of Defendants' college programs. California's community colleges "form the backbone of education in the state, serving 2.1 million students." Panchalam Decl. Ex. 1. LACCD proclaims that its "doors are wide open for a diverse student population eager for skills, knowledge and upward mobility" and that its vision is to provide "high quality, accessible, educational opportunities" and to "close[] persistent equity gaps." Panchalam Decl. Ex. 2. California's community colleges serve thousands of students with mobility-related disabilities. *Id.* Ex. 3, Disabled Student Programs

1  and Services Fact Sheet (CCCCO's DSPS served 12,983 "mobility impaired"

2  students during academic year 2012-13).

3    The WLAC campus is located on a hillside and has significant elevation

4  changes and distances between arrival points (such as parking lots or campus

5  entrances) and areas where services are provided (such as classrooms, the library,

6  and other locations on campus where students regularly go). Decl. of Jeff Mastin in

7  Support of Mot. for Prelim. Inj. ("Mastin Decl.") ¶¶ 3, 63. As a result, many people

8  with mobility impairments are excluded from accessing the services provided on

9  the WLAC campus due to their disability because they are not able to negotiate

10  such long distances and elevation changes. *Id.* ¶¶ 3, 132-140; *see also id.* ¶¶ 32-35

11  (explaining that excessive distance and elevation change are barriers to access for a

12  number of people with mobility impairments, and that the longer the route and the

13  greater the change in elevation, the more individuals will be excluded). For

14  Plaintiffs in particular, the distance, terrain, and other features on campus present

15  significant accessibility problems. *Id.* ¶ 6. Jeff Mastin, who has extensive

16  experience in designing, constructing, and maintaining facilities that are accessible

17  for persons with physical disabilities, provides his expert findings on the

18  accessibility barriers on the WLAC in his declaration, filed concurrently.

19
20    **B.  WLAC PREVIOUSLY OPERATED A SHUTTLE SERVICE THAT
   FACILITATED PROGRAM ACCESS TO INDIVIDUALS WITH
   DISABILITIES.**

21

22    Until February 2016, WLAC offered a Campus Shuttle service. The service

23  provided multi-seat shuttles, or trams, that were available seven days a week.

24  Panchalam Decl. Ex. 5 (Shuttle map). The Campus Shuttle picked up and dropped

25  off students at locations across the campus, including campus entrances, parking

26  lots, and classroom and other campus buildings. *Id.*

27    The Campus Shuttle was a critical means for Plaintiffs to reach all areas of

28  campus, including classroom buildings, the library, the bookstore, and WLAC

---

student service offices. *See* Declaration of Charles Anthony Guerra ("Guerra Decl.") ¶¶ 20-25; Declaration of Chrystal ("Chrystal Decl.") ¶¶ 15-18; Declaration of Karlton Bontrager ("Bontrager Decl.") ¶¶ 9-12. Plaintiffs could, and regularly did, call the service number for "door-to-door" service whereby the shuttle would pick them up wherever they were on campus and take them to their destination. *See* Guerra Decl. ¶¶ 21-22; Chrystal Decl. ¶ 16; Bontrager Decl. ¶ 13. Defendants recognized the importance of providing such a service for individuals with disabilities. The Campus Shuttle map prominently stated that "DISABLED PASSENGERS ARE GIVEN PRIORITY." Panchalam Decl. Ex. 5.

### C. DEFENDANTS TERMINATED THE CAMPUS SHUTTLE SERVICE AND FAILED TO PROVIDE ALTERNATIVE ASSISTANCE TO ENSURE ADEQUATE CAMPUS ACCESSIBILITY FOR INDIVIDUALS WITH DISABILITIES.

In February 2016, Defendants discontinued the Campus Shuttle service. *See* Panchalam Decl. Ex. 5. At that time, WLAC determined that it was appropriate to provide an alternative service to assist students with physical disabilities. WLAC posted on its web site: "The shuttle service has been discontinued. Disabled students who need assistance reaching a campus destination may contact the Campus Sheriff for [a] golf cart ride . . .." Panchalam Decl. Ex. 6.

But within a few weeks, on March 17, 2016, LACCD issued a memorandum asserting that WLAC and other colleges could not provide golf cart assistance to individuals with disabilities. The memorandum read, in pertinent part:

> ***Cannot Use Golf Carts for ADA Purposes***
>
> Please be advised, the Office of General Counsel has recently opined:
>
> **"There is no court decision requiring any of you to provide ADA shuttle service on campus. Any and all ADA accommodations must be provided only on a case-by-case basis and after a one-on-one interactive with the disabled person."**

Panchalam Decl. Ex. 7, LACCD, Information on the use of golf carts at the Colleges (emphasis in original).

Five days later, on March 22, 2016, WLAC announced that it would no longer provide *either* Campus Shuttle or golf cart services. Panchalam Decl. Ex. 6. WLAC offered no alternative service for students with disabilities. Mr. Guerra did, however, observe that Defendants continued to operate the Campus Shuttle for visitors during campus events. *See* Guerra Decl. ¶ 36.

Defendants' termination of transportation assistance services was a devastating blow to Plaintiffs. Defendants' actions have caused enormous harm – educationally, physically, and emotionally – for each Plaintiff, and made the experience of obtaining an education a daily nightmare for them.

**D. DEFENDANTS ARE DENYING PLAINTIFFS ACCESS TO CLASSES, ACADEMIC ACTIVITIES, AND OTHER CAMPUS SERVICES, EXCLUDING THEM FROM A NORMAL EDUCATIONAL EXPERIENCE AND PUTTING THEM AT RISK OF PHYSICAL INJURY EACH TIME THEY GO ON CAMPUS.**

1. Charles Guerra

Charles Guerra is a United States Army veteran. Guerra Decl. ¶ 3. Mr. Guerra received an honorable discharge after receiving a severe knee injury during military training. *Id.* ¶ 4. He also has a spinal cord condition that has damaged the nerve to his left leg, and he has undergone major surgery to treat this condition. *Id.* ¶ 10. His ability to walk is limited, and he uses a walker and a foot brace. *Id.* ¶¶ 11-14, 16. It is very difficult for him to walk on slopes, stairs, and uneven terrain, where he is at risk for dangerous falls. *Id.* ¶ 14.

Mr. Guerra is driven to continue to participate in civic life, to complete his education, and to find work through which he can give back to his community. Guerra Decl. ¶ 17. Like thousands of veterans, Mr. Guerra has sought to access the educational programs offered by California's community college system.[1] He has

---

[1] As the CCCCO has recognized: "A college education has become an absolute necessity for veterans returning to civilian life, and community colleges provide the majority of this education[.]" Panchalam Decl. Ex. 8, CCCCO, Veterans Services; *see also id.* (noting that 44,000 veterans and active duty service

attended WLAC since 2015. Guerra Decl. ¶ 7. He hopes to use his WLAC education to find work helping people, in particular veterans, recover from alcohol and drug abuse problems. *Id.* ¶ 8. Until it was discontinued, he would use the Campus Shuttle at least twice each day he was at school to get to classes and other activities on campus. *Id.* ¶ 24. With the shuttle service, Mr. Guerra would have to walk only short and generally flat distances. *Id.* ¶ 25. The service was essential for him to safely navigate campus and participate as a student. *Id.*

After the Campus Shuttle was discontinued, Mr. Guerra used the golf cart service. Guerra Decl. ¶¶ 27-28. The golf cart service was less timely and less reliable than the shuttle, but Mr. Guerra would still use it because he did not want to risk walking. *Id.* ¶ 28. After Defendants have discontinued all transportation services, Mr. Guerra experienced and continues to experience substantial difficulty getting around campus. Guerra Decl. ¶ 37. A determined student, he has endured physical pain each day trying to get to his classes and activities on his own. *Id.*

Mr. Guerra has attempted to obtain assistance so that he can participate fully as a WLAC student. He communicated his concerns to WLAC's office of Disabled Student Programs and Services, the Vice President of Administrative Services, and the school's Office of Veterans Affairs. Guerra Decl. ¶¶ 30, 32, 33; *see also id.* ¶¶ 49-51, 53, 57-59, 65, 71 (describing subsequent requests and in-person meetings). He was repeatedly denied assistance. *Id.* ¶¶ 32, 35, 41, 54, 60, 65, 71.

Unable to get the assistance that he needs, Mr. Guerra has faced, and continues to face, a denial of access to his education as well as real danger to his physical safety and well-being. For example, one day in May 2016, Mr. Guerra walked on his own to the campus bookstore, and then up a steep incline towards his scheduled class; on the incline, Mr. Guerra fell. Guerra Decl. ¶ 40. Campus staff

---

members enrolled in California community colleges in 2012-13). A significant number of veterans has a mobility or other disability. *Id.* Ex. 9, U.S. Census Bureau, Veteran Status 2014 American Community Survey 1-Year Estimates (as of 2014, 28.7% of veterans had a disability).

helped Mr. Guerra get up and get to class. *Id.* When the Campus Shuttle was in operation, Mr. Guerra was able to avoid the path where he fell. *Id*. That is, he would not have had to navigate this path on his own had the shuttle been available.

Mr. Guerra remained determined to continue with his education, despite the dangers he faced without the shuttle service. After enrolling for the summer term, Mr. Guerra asked for Defendants' help and was told that he should use Parking Lot A, which was closest to his classes but lacks a route that is accessible for him. *Id.* ¶ 41; Mastin Decl. ¶ 119 (route from the north end of Lot A to the MSA building is 640 feet long, located largely in vehicular traffic lanes); *see also id*. at ¶¶ 92-114 (describing distance, elevation changes, and other barriers to access on routes from the Lot A/ Lot 1/ Lot 2 area to locations of various campus services). The next day, Mr. Guerra parked in Lot A and set off on his own for class. Faced with the long and sloped path of travel, Mr. Guerra fell on his way to class, in full view of other students and campus visitors. Guerra Decl. ¶ 42. He was injured and taken by ambulance to the hospital. *Id.* ¶ 43. The incident left him in significant pain, caused him to miss classes, and was humiliating. *Id.* ¶¶ 42-47. Mr. Guerra would not have had to travel the path where he fell had the shuttle service been operational. *Id.* ¶ 42.

Mr. Guerra has continued to request modifications and assistance. Guerra Decl. ¶¶ 49-51, 53, 57-59, 65, 71. He and the other Plaintiffs requested the restoration of the Campus Shuttle at a July 18, 2016 meeting with Defendants; Defendants denied the request and offered no viable alternative. Defendants also denied Plaintiffs' request to hold the July 18 meeting in a more accessible location on campus. *Id.* ¶ 54. On August 18, 2016, Mr. Guerra attended an individual "ADA Interactive Meeting" at the suggestion of Defendants. *Id.* ¶¶ 55-56. Defendants demanded that the meeting occur in the Student Services Building, which is difficult for Mr. Guerra to get to without transportation assistance: he has difficulty walking the distance from the nearest parking lot, and the path is sloped.

Defendants again denied Mr. Guerra's request to relocate the meeting to a more accessible location. *Id.* ¶ 55. And at the meeting, Defendants again denied his request for shuttle service, and told him that he must navigate the paths from the parking lot areas on his own. *Id.* ¶ 60. Defendants' proposed solutions fail to provide accessibility for Mr. Guerra. *Id.* ¶¶ 61-64; Mastin Decl. ¶¶ 118-122, 142.

Mr. Guerra is enrolled in three classes on the WLAC campus for the Fall 2016 semester. Guerra Decl. ¶ 67. He is committed to continuing with his education, but he struggles getting around campus. *Id.* ¶ 68. Each day, he deals with the unsafe, strenuous, and painful experiences of getting to classes on his own. He fears that he will suffer further physical injury on campus and that he will be unable to complete all the classes in which he has enrolled, further delaying completion of his college program. *Id.* ¶¶ 68-70.

### 2. <u>Chrystal</u>

Ms. Chrystal has attended WLAC since 2013, after several years taking care of her medical condition and serving as the primary caregiver for her mother. Chrystal Decl. ¶ 3. She has a number of medical conditions and disabilities that affect her ability to get around on her own. *Id.* ¶¶ 7-11. Ms. Chrystal must keep an oxygen tank, attached to a wheeled cart, with her to assist with breathing. *Id.* ¶ 9. She has constant and significant back and leg pain, and has difficulty walking more than short distances, in particular on uneven surfaces and slopes. *Id.* ¶ 9. She cannot use a staircase that has more than two or three stairs. *Id.* ¶ 10.

Ms. Chrystal regularly used the WLAC Campus Shuttle to get to her classes and activities on campus. Chrystal Decl. ¶¶ 15, 17. Since Defendants terminated the Campus Shuttle, Ms. Chrystal has been forced to navigate, for example, stairways as well as the steep incline necessary to reach the Student Services building and General Classrooms building, which is extremely strenuous and dangerous for her. *Id.* ¶ 21.

1    Ms. Chrystal's participation in academic and student life has been

2  significantly restricted. She has relied heavily on the assistance of fellow students

3  to get around campus since the shuttle service was discontinued. Chrystal Decl. ¶¶

4  22-24. When her peers are not available, she has had no choice but to miss her

5  classes or campus activities. *Id.* ¶¶ 23-24. During the Summer 2016 session, given

6  the lack of accessibility on campus, she was limited to taking online courses,

7  although she learns best through in-person classes and wants to attend WLAC's

8  courses in a classroom setting. *Id.* ¶ 25.

9    Ms. Chrystal has tried repeatedly to get the assistance she needs to get

10  around campus and participate fully as a WLAC student. Chrystal Decl. ¶ 26, 27,

11  31-33, 38, 47. Defendants have refused to provide transportation assistance. *See id.*

12  ¶¶ 26, 29, 34, 45. Defendants' proposed solutions failed to provide adequate

13  accessibility for Ms. Chrystal. Mastin Decl. ¶¶ 123-125, 142.

14    Ms. Chrystal has persisted with her educational efforts and initially signed

15  up for two courses for the Fall 2016 semester. Chrystal Decl. ¶ 41. But with

16  Defendants' continued denial of transportation assistance, Ms. Chrystal realized

17  that the long and inaccessible routes she would have to face on her own would be

18  too dangerous and too arduous for her. *Id.* Four days before classes started, she

19  withdrew from one of her courses, a Spanish course, and considered dropping out

20  altogether until her friends convinced her to stay in school. She would have been

21  able to take the Spanish course had the shuttle still been operating. *Id.*

22    Chrystal is currently attending her remaining class and going to other on-

23  campus locations by relying on the assistance of friends, when they are available.

24  Chrystal Decl. ¶¶ 41-42, 44. She fears that she may be unable to complete her

25  classes, that her safety is at risk, and that she may not be able to complete her

26  certification and meet her goals due to the lack of access. *Id.* ¶ 45.

27

28

3. <u>Karlton Bontrager</u>

Karlton Bontrager has attended WLAC since 2014. Bontrager Decl. ¶ 4. For the past several years, he has been a part-time public library volunteer. *Id.* ¶ 3. He is working toward a certification as an Alcohol and Drug Abuse Counselor. He would like to find a job in this field after completing his college program so he can help people in his community recover from drug and alcohol abuse. *Id.* ¶¶ 5, 8.

Mr. Bontrager had a traumatic brain injury following a serious accident in 2002. Bontrager Decl. ¶ 6. This has resulted in a number of limitations.  He has a condition that causes weakness and limited mobility on the left side of his body. *Id.* He also has impaired balance, incomplete field of vision, and problems with fatigue. *Id.* He walks with a limp and sometimes drags his left leg. *Id.* ¶ 7. Due to his disabilities, he often experiences fatigue and difficulty walking, particularly when walking up and down stairs or slopes or for long distances. *Id.*

Mr. Bontrager used the WLAC Campus Shuttle service regularly to get to and from his classes and other campus locations. Bontrager Decl. ¶¶ 9, 12. Since Defendants terminated the Campus Shuttle, Mr. Bontrager has been forced to navigate long distances, including the long stretch of Albert Vera Drive that runs up the hill between the campus entrance and his classes. *Id.* ¶ 11. His route from the southwest campus entrance to the General Classrooms building involves over 1500 feet in distance and nearly 50 feet of elevation gain. Mastin Decl. ¶116. Without the Campus Shuttle service, it takes Mr. Bontrager an exceedingly long time to get to his classes, and he has been repeatedly late to class. Bontrager Decl. ¶¶ 15-16. He has fallen trying to get around campus on his own. *Id.* ¶¶ 18-20. For example, after Defendants ended the shuttle service, Mr. Bontrager fell while walking up the Albert Vera Drive incline on campus towards his class, injuring his knees. *Id.* ¶ 20.

Mr. Bontrager has attempted to resolve this situation, including attending two in-person meetings with Defendants on July 18, 2016 and August 18, 2016.

*See* Bontrager Decl. ¶¶ 21-23, 30, 34. Defendants denied his requests to have the in-person meetings take place in an accessible location on campus. *Id.* ¶¶ 24, 28. Defendants then refused to provide the transportation assistance that Mr. Bontrager requested and that he needs to participate as a student. *Id.* ¶¶ 26, 31.

Defendants' proposed solutions fail to provide adequate accessibility for Mr. Bontrager. Bontrager Decl. ¶¶ 32-34; Mastin Decl. ¶¶ 126-131, 142. Among other things, Defendants suggested that he ask his professors for "time accommodations" to allow him to arrive or leave 15-20 minutes late or early to class. *Id.* ¶ 34. Mr. Bontrager explained that he did not want to miss instructional time. *Id.*

Mr. Bontrager is enrolled in one class for the Fall 2016 semester. Bontrager Decl. ¶ 36. He would have enrolled in more classes, but he was afraid that he would not be able to attend and complete the classes without transportation assistance. *Id.* When he goes to campus, he experiences significant fatigue from walking up and down the hill, and from spending far more time walking on campus to get where he needs to go. *Id.* ¶ 38. He is very concerned that he will not be able to attend and complete his class this semester and the additional WLAC coursework that remains before he completes his program. *Id.* He feels that he is risking his safety each time he goes to school. *Id.* ¶¶ 38-39.

### E.  OTHERS HAVE ALSO INFORMED DEFENDANTS THAT THE TERMINATION OF SHUTTLE SERVICES DENIES ACCESS FOR STUDENTS AND OTHERS WITH DISABILITIES.

Plaintiffs are not the only people who have expressed grave concerns about Defendants' decision to discontinue the shuttle service and their failure to provide alternative assistance to ensure access. In February 2016, a WLAC professor wrote to WLAC's Vice President of Administrative Services about the discontinued shuttle service, asking: "What about the transportation of faculty & staff that may have mobility issues?" Panchalam Decl. Ex. 10. She stated that the matter

"require[s] immediate attention." *Id.* When Defendants responded that they "must at least temporarily suspend the shuttle service,"[2] she responded forcefully:

> The issue is that we have faculty and perhaps students that need this service to move around this campus. What should we do if a faculty member cannot walk all the way from the parking lot to a class in GC, or MS building?
>
> We have a current problem that demands an immediate solution.

*Id.* In March 2016, another WLAC professor wrote to the Work Environment Committee with concerns about the termination of the Campus Shuttle and the inadequacy of the (also now-terminated) golf cart service. He wrote that "I have contacted the District ADA person, and he has been totally unresponsive." Panchalam Decl. Ex. 11. The professor made a plea for a solution that would meet the needs of WLAC's disabled community: "What about our current and future students and staff at this college??" *Id.*

## III.   **LEGAL STANDARD**

To obtain a preliminary injunction, Plaintiffs "must establish [1] that [they are] likely to succeed on the merits, [2] that [they are] likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [their] favor, and [4] that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). The Court may balance the weight of each element as long as Plaintiffs meet a certain threshold for each. *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011).

A preliminary injunction is also appropriate "where the likelihood of success is such that 'serious questions going to the merits were raised and the balance of

---

[2] Defendants' response to this professor stated that "[t]he shuttle service was created and intended to be a temporary solution to an ADA accessibility issue prior to the creation of the bus-turnaround in front of lot 5." *Id.* As discussed in Mr. Mastin's expert declaration, the "bus-turnaround" does not provide adequate access for Plaintiffs and others with mobility-related disabilities. *See* Mastin Decl. ¶¶ 129-130 (explaining that fixed-route public bus drops off and picks up at fixed locations only, on a limited schedule, and does not assist with travel to other arrival points).

hardships tips sharply in [plaintiff's] favor.'" *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003)). Accordingly, where the balance of hardships weighs heavily in Plaintiffs' favor, there is a likelihood of irreparable injury, and the injunction is in the public interest, then a preliminary injunction should be granted where plaintiffs show there are "serious questions going to the merits." *Id.* at 1135.

Courts have approved preliminary injunctive relief under the ADA, including mandatory injunctions. *See, e.g.*, *Rodde v. Bonta*, 357 F.3d 988 (9th Cir. 2004); *Hernandez v. Cty. of Monterey*, 110 F. Supp. 3d 929, 959 (N.D. Cal. 2015).

## IV.   THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION

Each element of the preliminary injunction test weighs strongly in favor of an injunction. The Court should therefore issue preliminary injunctive relief.

### A. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

1. <u>Plaintiffs Will Prevail on Their Federal Law Claims.</u>

   a) *Defendants Have Violated the ADA and Section 504 by Excluding Plaintiffs from, and Denying Them Meaningful Access to, WLAC's College Programs.*

Title II of the ADA prohibits discrimination on the basis of disability by state and local government entities. 42 U.S.C. § 12131 *et seq.* The law provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130. Section 504 of the Rehabilitation Act, which applies to Defendants as public entities receiving federal funds, forbids covered entities from excluding individuals with disabilities or denying them an equal opportunity to receive program benefits and services. 29 U.S.C. § 794 *et seq.*;

1   34 C.F.R. § 104.4. Courts generally analyze Title II and Section 504 claims

2   together. *Armstrong v. Wilson*, 124 F.3d 1019, 1023 (9th Cir. 1997).

3   "Congress enacted the ADA in 1990 to remedy widespread discrimination

4   against disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001).

5   "The statute provides a 'comprehensive,' 'broad mandate' to eliminate

6   discrimination against disabled persons, addressing both 'outright intentional

7   exclusion' as well as the 'failure to make modifications to existing facilities and

8   practices.'" *Fortyune v. City of Lomita*, 766 F.3d 1098, 1101 (9th Cir. 2014)

9   (quoting *Martin*, 532 U.S. at 675), *cert. denied*, 135 S. Ct. 2888 (2015). Courts

10  "construe the language of the ADA broadly to advance its remedial purpose."

11  *Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014). "The ADA

12  proscribes not only 'obviously exclusionary conduct' but also 'more subtle forms

13  of discrimination—such as difficult-to-navigate restrooms and hard-to-open

14  doors—that interfere with disabled individuals' full and equal enjoyment' of public

15  places and accommodations." *Bassilios v. City of Torrance*, No. CV-1403059

16  ABJEMX, 2015 WL 10570160, at *4 (C.D. Cal. Dec. 4, 2015) (quoting *Chapman*

17  *v. Pier 1 Imps. (U.S.) Inc.*, 631 F.3d 939, 945 (9th Cir. 2011) (en banc)).

18  Plaintiffs satisfy each element of a claim under Title II: (1) they are qualified

19  individuals with a disability; (2) they were either excluded from participation in or

20  denied the benefits of Defendants' services, programs, or activities, or were

21  otherwise discriminated against by Defendants; and (3) such exclusion, denial, or

22  discrimination was by reason of their disability. *See Cohen*, 754 F.3d at 695. Here,

23  there is no question that Plaintiffs have an impairment that substantially limits one

24  or more major life activities, including walking. 42 U.S.C. § 12102(2)(A).

25  In evaluating whether discrimination has occurred regarding access to public

26  programs, activities, and services, courts evaluate whether people with disabilities

27  have been denied "meaningful access" to those programs, activities, and services.

28  *Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir. 1996) (applying the meaningful

access standard in the Title II context); *Alexander v. Choate*, 469 U.S. 287, 302 (1985) (applying the meaningful access standard to an entity covered by Section 504). In *Crowder*, for example, the Ninth Circuit concluded that Hawaii's quarantine requirement for dogs denied the plaintiffs, who were blind and used guide dogs, "meaningful access" to services, programs, and activities, and therefore discriminated against the plaintiffs by reason of their disability. 81 F.3d at 1484; *see also Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 202 (2d Cir. 2014) (ordering injunctive relief requiring Board of Elections to take affirmative steps to provide individuals with meaningful access to voting program); *Communities Actively Living Indep. & Free v. City of Los Angeles ("CALIF")*, No. CV 09-0287 CBM (RZx), 2011 WL 4595993, at *15 (C.D. Cal. Feb. 10, 2011) (finding unlawful discrimination where city's emergency preparedness program failed to address the needs of individuals with disabilities and thus denied them meaningful access to the program).

WLAC was built on the side of a hill. Mastin Decl. ¶ 3. Campus services such as the library, student services, and the classroom buildings for classes that Plaintiffs need to take are, as a general matter, located in an area of campus with relatively greater elevation. *Id*. ¶¶ 60-61, 66 and Ex. B. The main parking areas are located at an elevation well below those buildings (Lots 4 and 5), to the far south (the South Parking Structure), or to the far north (Lots A, 1, and 2). *Id.* ¶¶ 66, 89, 92. The routes from these parking areas to services provided on campus have distance and elevation changes that pose significant barriers for Plaintiffs. *Id.* ¶¶ 63-115. These routes also have a number of elements that do not comply with disability access design standards and represent additional barriers to access. *Id.* Plaintiff Bontrager, who generally arrives at the campus entrance, faces the significant hardship of having to navigate, on foot, an even greater distance with a very difficult elevation change. *Id.* ¶ 127.

As demonstrated through Plaintiffs' experiences since the Campus Shuttle was discontinued, the distance, elevation change, and other physical barriers to accessing primary campus locations deny Plaintiffs meaningful access to Defendants' services, programs, and activities. They cannot do things that may be simple matters for students without disabilities, such as attend class or visit the library, without difficulty and even risk to their safety. As a result, they are missing educational opportunities from which they otherwise would be able to benefit.

Under the ADA, a public entity must take affirmative steps to ensure access to programs, services, and activities, unless doing so would be a fundamental alteration or present an undue burden. *See* 28 C.F.R. § 35.150(a)(3); *see also Dopico v. Goldschmidt*, 687 F.2d 644, 652 (2d Cir. 1982) ("It is not enough to open the door for the handicapped . . . . a ramp must be built so the door can be reached."); *CALIF*, 2011 WL 4595993, at *14; *Dunlap v. Ass'n of Bay Area Governments*, 996 F. Supp. 962, 965-66 (N.D. Cal. 1998). Public entities must consider all available methods to ensure meaningful access. 28 C.F.R. § 35.150(b)(1); *see also Crowder*, 81 F.3d at 1483 (noting that Congress intended to address not only "intentional exclusion" but also "the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, [and] failure to make modifications to existing facilities and practices") (quoting 42 U.S.C. § 12101(a)(5)).

> *b) A Campus Shuttle Service Is a Reasonable and Effective Method of Ensuring Adequate Access for Plaintiffs.*

Defendants could ensure that Plaintiffs have meaningful access to services, programs, and activities despite the physical inaccessibility of campus by providing transportation assistance. The record makes clear that provision of such assistance is feasible, and does not represent an undue burden or fundamental alteration.

First, until recently, Defendants operated a Campus Shuttle that was available to anyone on campus. *See* Guerra Decl. ¶¶ 23-25; Chrystal Decl. ¶¶ 15-

18; Bontrager Decl. ¶¶ 9,12. Provision of shuttle services to Plaintiffs, or any other individuals prevented from accessing the campus due to its physical inaccessibility, would be even less of a financial or administrative burden. Even today, WLAC continues to operate a shuttle service for visitors during campus events, as Plaintiff Guerra has observed. *See* Guerra Decl. ¶ 36; *see also* Mastin Decl. ¶¶ 143-146 (explaining that there should be nothing preventing Defendants from providing transportation assistance, and that even if Defendants needed to procure a new vehicle, they could do so at relatively minor cost).

Second, the California Community Colleges Chancellor's Office's *2015 Implementing Guidelines for Title 5 DSPS Regulations*, published in January 2016, describe the assistance that Plaintiffs seek, and which Defendants until earlier this year provided: "Mobility assistance [] includes **on-campus manual or motorized transportation** to and from college courses and related educational activities including the provision of tram services. Specialized transportation around campus may be the best method of ensuring equal access on large campuses, or difficult terrain." Panchalam Decl. Ex. 13 at 27 (emphasis in original).

Third, LACCD's *own* policy provides that its colleges may provide "[o]n-campus mobility assistance, including manual or motorized transportation to and from classrooms and other related educational activities" as a service or accommodation to "enable[] students with disabilities to participate in regular activities, programs, and classes offered by the college." *See* Panchalam Decl. Ex. 12, at 1-2, LACCD A.R. E-100, *Criteria for Serving Students with Disabilities*. As with the CCCCO's guidance, this policy recognizes transportation assistance as an appropriate solution to the problem of a physically inaccessible campus. LACCD cannot credibly take the position that its own policy permits a practice that is an undue burden or a fundamental alteration of the services its campuses provide.

Fourth, transportation assistance is specifically contemplated by federal law. "A public entity shall operate each service, program, or activity so that the service,

program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a). In other words, even where physical facilities were constructed before the effective date of the ADA, the program as a whole must be accessible to people with disabilities. Specified methods of achieving program access include "acquisition of equipment" and "use of accessible rolling stock or other conveyances," which would include trams or other shuttle vehicles. 28 C.F.R. § 35.150(b)(1). This is consistent with state law regarding Disabled Student Programs and Services at community colleges. *See* Cal. Code Regs. tit. 5, § 56026 (describing "specialized aids, devices and/or services available to students with disabilities . . . which are in addition to the general services provided to all students" and "enable students to participate in general activities, programs and classes offered by the college").

   If Defendants were to take the position that provision of meaningful access to people with disabilities through transportation assistance were an undue burden or fundamental alteration under the ADA, such a determination would need to be made by WLAC and LACCD leadership after considering all resources available, and it would need to be accompanied by a written statement of the reasons for reaching such a conclusion. *See* 28 C.F.R. § 35.150(a)(3). Plaintiffs are aware of no such determination by Defendants or written statement to support it.

   In fact, Defendants' publicly available memorandum on the termination of shuttle services emphasizes only that such services are not currently required *by court order*. *See* Panchalam Decl. Ex. 7 at 2.[3] In other words, Defendants will not stop violating federal law at the expense of Plaintiffs' education and well-being unless ordered to do so.

---

   [3] The memorandum emphasizes concerns that "using golf carts as a shuttle service poses significant liability issues to the College and District. First and foremost is the requirement that all services comply with ADA requirements[.]" *Id.* Concerns about the accessibility of a particular vehicle or method of transportation does not excuse the denial of campus accessibility on a large scale for individuals with disabilities. *See* 28 C.F.R. § 35.150(a)(3).

It does not matter that Defendants do not provide students without disabilities at WLAC with transportation assistance to access the campus. Federal disability law "requires affirmative accommodations[4] to ensure that facially neutral rules" – here, the current policy of not providing a transportation service to any students despite the inaccessibility of campus – "do not in practice discriminate against individuals with disabilities." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 274-75 (2d Cir. 2003); *see also Dunlap v. Ass'n of Bay Area Governments*, 996 F. Supp. 962, 966 (N.D. Cal. 1998) ("Discrimination may be shown precisely where the defendant treated plaintiff *the same* as everyone around her, despite her need for reasonable accommodation.") (emphasis in original).

Where there is a denial of meaningful access, including the failure to provide necessary transportation-related modifications or services, injunctive relief is warranted. *See, e.g.*, *Galusha v. New York State Dep't of Envtl. Conservation*, 27 F. Supp. 2d 117, 124-25 (N.D.N.Y. 1998) (finding that denial of transportation-related modifications in state park had effect of denying individuals with disabilities meaningful access to essential areas, and granting preliminary injunction); *Crowder*, 81 F.3d at 1484; *Rodde v. Bonta*, 357 F.3d 988 (9th Cir. 2004) (affirming preliminary injunction where planned closure of public facility providing specialized programs for the disabled would result in individuals with disabilities being "effectively denied services that the non-disabled continued to receive").

### c)  Defendants Have Failed to Offer Any Alternative Reasonable Modification that Ensures Adequate Access for Plaintiffs.

Since removing the service that had provided Plaintiffs access to campus programs, services, and activities, Defendants have failed to offer alternative methods, services, or modifications to address Plaintiffs' disability needs.

---

[4] Although Title II of the ADA uses the term "reasonable modification" rather than "reasonable accommodation," courts use these terms interchangeably in this context.

1    Defendants have told Mr. Guerra and Ms. Chrystal to park in specific

2    campus parking lots and identified lots that are nearest their classes. This proposal

3    is no solution at all, and leaves them to face significant accessibility barriers,

4    including stairs, difficult and uneven terrain, and long distances without assistance.

5    *See* Mastin Decl. ¶¶ 117-125; Guerra Decl. ¶¶ 60-64; Chrystal Decl. ¶¶ 34-36.

6    For Mr. Bontrager, who cannot drive and who generally arrives at the

7    bottom-of-the-hill campus entrance, Defendants suggested that he find others to

8    give him a car ride to specific locations on campus. Bontrager Decl. ¶ 32. Such a

9    suggestion also fails to address his access needs. He does not and cannot always get

10   a car ride to school, and has great difficulty traveling up and down the hill from the

11   campus entrance nearest to his home. Mastin Decl. ¶¶ 127-131; Bontrager Decl. ¶¶

12   11, 32. In sum, Defendants' proposals deny Plaintiffs adequate access to classes,

13   programs, and services on campus, compromise Plaintiffs' ability to pursue their

14   educational goals, and put Plaintiffs at risk of injury each time they go on campus.

15   Defendants' other gestures to address Plaintiffs' disability-related needs are

16   also inadequate. For example, Defendants proposed that Mr. Bontrager ask his

17   professors for "time accommodations" to arrive late to class or leave class early.

18   Bontrager Decl. ¶ 34. But forcing students to miss instructional time is no

19   modification at all. Other suggestions by Defendants are similarly insufficient. *See,*

20   *e.g.*, Chrystal Decl. ¶ 37 (Defendants' proposal that Ms. Chrystal use "e-books"

21   rather than hard copy school books to reduce what she must carry on campus,

22   ignoring that many books are not available electronically and that this would do

23   little to address the fact that routes on campus are inaccessible to her even when

24   she is not carrying anything but her oxygen tank).

25   Defendants have failed to provide meaningful access so that Plaintiffs are

26   able to participate as college students in a manner similar to their non-disabled

27   peers. This constitutes illegal discrimination. *See* 28 C.F.R. § 35.150(b)(1) ("In

28   choosing among available methods [for ensuring program access, an entity must]

give priority to those methods that offer services, programs, and activities to qualified individuals with disabilities in the most integrated setting appropriate."); *see also* 34 C.F.R. § 104.4(b)(2); *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012) (in ADA Title III case, holding that Disney "must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience").

2.   Plaintiffs Will Prevail on Their State Law Claims.

Defendants have violated the Unruh Civil Rights Act ("Unruh Act") and California Government Code § 11135. The Unruh Act provides that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their . . . disability . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments[.]" Cal. Civ. Code § 51(b). For Unruh Act purposes, public schools are business establishments. *See Sullivan v. Vallejo City Unified Sch. Dist.*, 731 F. Supp. 947, 952 (E.D. Cal. 1990). A violation of the ADA constitutes a violation of the Unruh Act. Cal. Civ. Code § 51(f); *Hubbard v. SoBreck*, 554 F.3d 742, 745 (9th Cir. 2009).

Defendants have also violated state law prohibiting any entity that receives state financial assistance from denying "full and equal" access to persons with disabilities. *See* Cal. Gov't Code § 11135(a). An entity that violates the ADA or Section 504 has violated Section 11135. *See, e.g.*, *Y.G. v. Riverside Unified Sch. Dist.*, 774 F. Supp. 2d 1055, 1065-66 (C.D. Cal. 2011); *D.K. ex rel. G.M. v. Solano Cnty. Office of Educ.*, 667 F. Supp.2d 1184, 1191 (E.D. Cal. 2009).

Thus, Plaintiffs are likely to prevail on their state law claims, providing additional bases for preliminary injunctive relief.

**B.  PLAINTIFFS WILL BE IRREPARABLY HARMED IN THE ABSENCE OF PRELIMINARY RELIEF.**

The scope and seriousness of irreparable harm faced by Plaintiffs warrant prompt and effective preliminary injunctive relief. *See Lewis v. Casey*, 518 U.S.

343, 349 (1996) ("It is the role of courts to provide relief to claimants . . . who have suffered, or will imminently suffer, actual harm . . ..").

Fall classes have begun. Without campus transportation assistance, Plaintiffs have had to choose between putting their educational pursuits on hold and enduring a college experience fraught with limitations and safety risks. With either choice, Plaintiffs face significant, irreparable harm that is unacceptable under the law.

Each class and school activity in which Plaintiffs are unable to participate due to lack of access disrupts their educational progress in ways they can never get back. Defendants' denial of meaningful access prevents Plaintiffs from pursuing their educational and professional goals. *See* Chrystal Decl. ¶¶ 43, 45; Guerra Decl. ¶¶ 69-70, 46-48. This is irreparable harm. *See Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1165-66 (9th Cir. 2011) (finding plaintiff demonstrated irreparable harm in the form of the loss of opportunity to pursue her chosen profession); *Featherstone v. Pac. Nw. Univ. of Health Scis.*, No. 1:CV-14-3084-SMJ, 2014 WL 3640803, at *6 (E.D. Wash. July 22, 2014) (being made to wait to pursue medical education constitutes irreparable harm).

Plaintiffs have also suffered painful, humiliating, and emotionally upsetting injuries on campus while trying to persevere with their classes and educational programming. *See* Guerra Decl. ¶¶ 39-48; Bontrager Decl. ¶¶ 18-20. The likelihood of further physical injury Plaintiffs face each time they go to class at an inaccessible campus demonstrates a substantial risk of irreparable harm. *See Von Colln v. Cty. of Ventura*, 189 F.R.D. 583, 598 (C.D. Cal. 1999) ("Defendants do not argue that pain and suffering is not irreparable harm, nor could they.").

Defendants' denial of access also harms Plaintiffs' emotional well-being. *See* Guerra Decl. ¶¶ 45-47, 68-70 (describing loss of confidence, anxiety, and trouble focusing on classes after falling on campus, and concern that he will not be able to complete his classes without transportation assistance); Chrystal Decl. ¶¶ 44-45; Bontrager Decl. ¶¶ 18-19. This kind of disability discrimination also constitutes

irreparable harm. *See Chalk v. U.S. Dist. Court Cent. Dist. of California,* 840 F.2d 701, 709 (9th Cir. 1988) ("psychological and physiological distress" caused by disability discrimination is substantial and irreparable injury); *Tamara v. El Camino Hosp.*, 964 F. Supp. 2d 1077, 1087 (N.D. Cal. 2013).

## C. BALANCE OF EQUITIES TIPS IN PLAINTIFFS' FAVOR.

The balance of equities weighs heavily in Plaintiffs' favor, given the serious and irreparable harms they will suffer if a preliminary injunction does not issue. Defendants, by contrast, cannot credibly argue that they will suffer significant harm from the issuance of a preliminary injunction requiring them come into compliance with the law and restore – at a smaller scale – a service (*i.e.*, the Campus Shuttle) that Defendants until recently operated and that provided such access. In fact, Defendants continue to operate what appear to be *ad hoc* shuttle services for visitors and guests, including during special campus events. Guerra Decl. ¶ 36.

## D. A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST.

A preliminary injunction would promote the public interest, satisfying the fourth element of the standard for preliminary injunctive relief. Congress has made clear through its enactment of the ADA that the public has an interest in ensuring the eradication of discrimination on the basis of disabilities. 42 U.S.C. § 12101(a)(8) (finding that "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous…"). This public interest is served by requiring entities to take steps to "assure equality of opportunity" for people with disabilities. *Id.* § 12101(a)(7); *see Enyart*, 630 F.3d at 1167 (upholding district court's grant of preliminary instruction and affirming that enforcement of the ADA served the public interest). The public also has a strong interest in the achievement of an integrated society in which people with disabilities are able to fully participate, particularly in the state's public system of higher education.

## V.     THE COURT SHOULD NOT REQUIRE A BOND

Under Federal Rule of Civil Procedure 65(c), courts have discretion when granting a preliminary injunction to set no bond or only a nominal bond. *See Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005). A waiver of the bond requirement is supported, as in this case, when the injunction serves the public interest, when Plaintiffs are likely to prevail, and where the suit is brought by individuals with limited means. *See Hernandez*, 110 F. Supp. 3d at 958-59; *Baracoa-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999). Courts may also waive the bond requirement where there is no likelihood of significant harm to a defendant from the injunction. *See, e.g.*, *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). Plaintiffs are students with limited means. *See* Guerra Decl. ¶ 73; Chrystal Decl. ¶ 48; Bontrager Decl. ¶ 40. Defendants will not face significant harm if required to ensure access for Plaintiffs, particularly through a service that they provided for years and that is consistent with CCCCO's and LACCD's guidance. Courts also have discretion to dispense with the bond requirement where requiring a bond would effectively deny access to judicial review. *See Save Our Sonoran*, 408 F.3d at 1126. Requiring Plaintiffs to provide a bond would amount to requiring them to pay for the assistance to which they are entitled, and would may deny them access to judicial review. The Court therefore should not require a bond.

## VI.     CONCLUSION

The Court should enter a preliminary injunction, as outlined in the concurrently filed Proposed Order, that ensures that Plaintiffs will have meaningful access to programs, services, and activities on WLAC's campus.

Dated: September 15, 2016                    Respectfully submitted,

DISABILITY RIGHTS CALIFORNIA

By:     */s/ Aaron J. Fischer*
AARON J. FISCHER
*Attorneys for Plaintiffs*