1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11  CHARLES ANTHONY GUERRA,          ⎫   Case No. CV 16-6796-MWF (KSx)
    CHRYSTAL, and KARLTON           ⎬
12  BONTRAGER,                       ⎬   **FINDINGS OF FACT AND**
                                     ⎬   **CONCLUSIONS OF LAW**
13                    Plaintiffs,    ⎬
                                     ⎬
14          v.                       ⎬
                                     ⎬
15                                   ⎬
    WEST LOS ANGELES COLLEGE and    ⎬
16  LOS ANGELES COMMUNITY           ⎬
    COLLEGE DISTRICT,               ⎬
17                                   ⎬
18                    Defendants.    ⎬
                                     ⎭
19

20  _____

21          This matter came on for trial before the Court sitting without a jury on October 17-

22  20, and November 14-15, 2017.  Following the presentation of argument, the matter was

23  taken under submission.

24          Having carefully reviewed the record and the arguments of counsel, as presented at

25  the hearing and in their written submissions, the Court now makes the following findings

26  of fact and reaches the following conclusions of law pursuant to Rule 52 of the Federal

27  Rules of Civil Procedure.  Any finding of fact that constitutes a conclusion of law is also

28

                                        -1-

hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is also hereby adopted as a finding of fact.

The verdict is returned in favor of Defendants. The verdict is not based on the lack of credibility of Plaintiffs. As the Court indicated during trial, the Court has respect for Plaintiffs, each of whom has undergone hardships in attempting to secure an education at a public college. Nonetheless, the law simply does not authorize the Court to correct all wrongs. Ultimately, it is the responsibility of the Board of Trustees of the Los Angeles Community College District to determine the budget and administration of the District.

## I. FINDINGS OF FACT

### A. The Parties

1. Defendant West Los Angeles College ("WLAC") is a public community college located in Culver City, California. Along with other Los Angeles community colleges, WLAC is part of Defendant Los Angeles Community College District ("LACCD").

2. WLAC and LACCD are public entities within the meaning of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131(1)(A). WLAC and LACCD are also public entities receiving public funds within the meaning of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; 34 C.F.R. § 104.4.

3. Plaintiff Charles Guerra has been a student at WLAC since 2015. He obtained his certification as an Alcohol and Drug Abuse Counselor in June 2017. Mr. Guerra continues to enroll in WLAC courses, working to earn credits that will apply to higher-level degrees, including a bachelor's degree.

4. Mr. Guerra has a spinal cord condition that has damaged the nerve to his left leg, and he has undergone surgery to treat this condition. His ability to walk is limited, and he uses a walker and a foot brace.

5. Mr. Guerra drives himself to the WLAC campus. He has a disabled placard from the California Department of Motor Vehicles that allows him to park in disabled parking spots.

6. Plaintiff Chrystal (her full legal name) has been a student at WLAC since 2013. She is currently enrolled and is seeking a certificate in Alcohol and Drug Abuse Studies.

7. Ms. Chrystal has emphysema and fibromyalgia, and has suffered bulging discs in her spine and peripheral nerve damage. She must have an oxygen tank with her at all times to assist with her breathing. She cannot lift the oxygen tank; it is attached to a wheeled cart. She often finds it difficult to walk more than several steps.

8. Ms. Chrystal drives herself to the WLAC campus. She has a disabled placard from the California Department of Motor Vehicles that allows her to park in disabled parking spots.

9. Plaintiff Bontrager began attending WLAC in the fall of 2014. He is currently enrolled and is seeking a certification as an Alcohol and Drug Abuse Counselor.

10. Mr. Bontrager sustained a right-side brain injury as a result of a snowboarding accident in 2002. His left side is partially paralyzed, his leg drags when he walks, and he has some balance problems.

11. Mr. Bontrager lives approximately one-half mile from the WLAC campus. He usually walks to campus, and occasionally takes the Culver City public bus.

**B.     The Witnesses**

12. Jack Rubensaal, a now-retired professor of political science at WLAC, testified on October 17, 2017. He has difficulty walking and has used a cane since 2011. He testified about his experiences navigating the WLAC campus and accommodations WLAC provided to him.

13. Ms. Chrystal testified on October 17, 2017 about her experiences navigating the WLAC campus and her interactions with WLAC administrators.

14. Mr. Guerra testified on October 17 and 18, 2017 about his experiences navigating the WLAC campus and his interactions with WLAC administrators.

15.     Dr. Shalamon Duke, WLAC's Dean of Support Services, testified on October 18, 2017.  He testified about the accessibility of the WLAC campus, the now-discontinued on-campus shuttle service, and his interactions with Plaintiffs.

16.     Jeff Mastin, Plaintiffs' disability access expert, testified on October 18 and 19, 2017.  He testified about his inspection of the WLAC campus and his ultimate opinion that the campus is presently inaccessible to Plaintiffs.

17.     Dr. Lisa Meeks, a disability access consultant who has worked with numerous colleges and who was engaged by Plaintiffs, testified on October 19, 2017 about disability access services offered on other college campuses in the United States.

18.     Iris Ingram, WLAC's Vice President of Administrative Services, testified on October 19, 2017 about her decision to terminate the on-campus shuttle service and her interactions with Plaintiffs.

19.     Mr. Bontrager testified on October 19 and 20, 2017 about his experiences navigating the WLAC campus and his interactions with WLAC administrators.

20.     Larry Brandon, a custodian at WLAC who had been tasked with operating the on-campus shuttles before that service was terminated, testified on October 20, 2017 about his experiences driving the on-campus shuttle.

21.     Jasper Kirsch, WLAC's disability access expert, testified on November 14, 2017 about his inspection of the WLAC campus and his ultimate opinion that the campus is presently accessible to Plaintiffs.

///
///
///
///
///
///
///
///

## C.    The WLAC Campus

22.    Below is a map of the WLAC campus (available on WLAC's website):



23.    The campus, as depicted above, is oriented as follows: College Boulevard (at the left side of the map) is to the north; Freshman Drive (at the bottom of the map) is to the west; Stocker Street (at the right side of the map) is to the south; and Sophomore Drive (at the top of the map) is to the east.  Generally speaking, the campus runs uphill from the west to the east (*i.e.,* Freshman Drive is at a lower elevation than Sophomore Drive).

24.    The campus is split into tiers, with different classes, student services, and campus activities on each.

25.    The Student Services Building ("SSB") (the building depicted in orange on the map) and the General Classrooms building ("GC") (the building immediately to the right of the SSB) are located on the campus's middle tier.

26.    The Fine Arts building ("FA"), the Math and Sciences A building ("MSA"), the HLRC (the library), the CE building, and the SC building (all to the east of the SSB

and GC and to the north of the South Parking Structure ("SPS")) are all along a pedestrian mall on the campus's upper tier (the "Pedestrian Mall") (the white area depicted on the map to the east of the FA and HLRC).

27. The white rectangular area depicted on the map between the SSB and the GC is a pedestrian walkway (the "SSB/GC Walkway"). At the east end of SSB/GC Walkway, there is a functional elevator that links the campus's middle tier with its upper tier.

28. At the west end of the SSB/GC Walkway (where the walkway meets B Street), there is a bus stop. The Culver City bus drops passengers off there.

29. Immediately to the south of the bus stop, on B Street in front of the GC, is a handicap drop-off area (depicted on the map with a handicap symbol). The paratransit service operated by the Access Los Angeles organization drops eligible riders off there.

**D. The On-Campus Shuttle Service and the Termination of that Service**

30. From approximately August 2011 to February 2016, WLAC and LACCD operated an on-campus shuttle service on the WLAC campus. The shuttles were extended golf carts. Plaintiffs and other students with mobility issues utilized the shuttle service to get around campus.

31. In 2011, Larry Brandon and another WLAC custodial employee were reclassified as paratransit drivers and assigned to drive the golf carts.

32. An August 1, 2011 "classified staffing request" relating to the paratransit shuttle driver position described the job as follows: "Transit Shuttle Driver duties: providing shuttle/transport services to students on the terraced and hilly terrain at WLAC per ADA guidelines, and to aid those students with related needs during transport."

33. According to the LACCD job description, the WLAC paratransit shuttle driver "[o]perates a light vehicle to pick up and transport students, faculty, and/or staff with disabilities to various points within assigned campus areas and performs the full range of custodial services when transportation services are suspended, rescheduled, or not required."

34.     Below is a picture of the campus map with the shuttle route (in dark blue) and shuttle stops (the numbered yellow dots):



Case 2:16-cv-06796-MWF-KS   Document 58-26   Filed 04/17/17   Page 2 of 2   Page ID #:1913

Case 2:16-cv-06796-MWF-KS   Document 12-5   Filed 09/15/16   Page 2 of 2   Page ID #:103

35.     WLAC gave eligible students a card that listed a phone number for them to call when they needed a ride. The students would speak with one of the two WLAC paratransit drivers when they needed a ride and the paratransit driver on duty would pick them up at the requested location along the shuttle route.

36.     Iris Ingram has held the position of Vice President of Administrative Services at WLAC since June 1, 2015, when she joined WLAC from Moorpark College, another community college in the LACCD system. Among other things, she is responsible for transportation services at WLAC and she is the ADA coordinator. Soon after she arrived at WLAC, she noticed the custodial employees driving disabled students around campus on golf carts. She was concerned that there were not enough custodians doing custodial work and that they may not have been properly trained to transport disabled students, and she questioned other administrators about the practice. Alan Hansen, the director of

facilities, informed Ms. Ingram that the shuttle service began as a workaround to on-campus construction and had continued despite the completion of the construction.

37. In early 2016, Ms. Ingram consulted with David Serrano, the Director of Risk Management for LACCD, about WLAC's shuttle service. Mr. Serrano opined that Ms. Ingram should discontinue the on-campus shuttle service.

38. Pursuant to Ms. Ingram's directive, WLAC terminated its on-campus shuttle service in February 2016.

39. For several weeks after WLAC terminated its own shuttle service, students were able to call the Los Angeles Sheriff's Department for on-campus golf cart rides. Sheriff's Department cadets drove those carts, which were smaller than the extended carts that the WLAC custodians/paratransit drivers utilized.

40. On March 17, 2016, Mr. Serrano issued a memorandum indicating that WLAC and other LACCD colleges "cannot use golf carts for ADA purposes" and that "[t]here is no court decision requiring any of you to provide ADA shuttle service."

41. On March 22, 2016, WLAC announced that it would no longer provide any form of on-campus transportation. Since that date, no on-campus transportation has been available for Plaintiffs or other WLAC students.

**E.    Plaintiffs' Experiences With and Without the Shuttle**

42. Prior to the termination of on-campus shuttle service Mr. Guerra would drive himself to campus, park in a handicap space in Lot 5 and call for a ride. A shuttle driver would pick him up at the Lot 5 pick-up location and transport him to the drop-off location closest to the building he had class in. When he was done with class for the day, he would call for a ride and receive a ride back to the Lot 5 drop-off location. Mr. Guerra found the shuttle service to be convenient, reliable, and safe, particularly when it was operated by the WLAC custodians / paratransit drivers (as compared to the Sheriff's Department cadets).

43. Since the termination of the shuttle service, Mr. Guerra has continued to drive himself to campus, but has parked in the SPS and accessed the rest of campus via

the Pedestrian Mall. Mr. Guerra walks from the SPS to his classes along the Pedestrian Mall, using his walker or cane.

44. Mr. Guerra has struggled walking the distance of the Pedestrian Mall and has also struggled manipulating his walker to avoid spaces between the concrete slabs that comprise the walkway. On one occasion, a film crew was filming near the Pedestrian Mall and he fell down when the wheels of his walker got caught on a piece of hard plastic that was covering electrical wires running across the path. He has also fallen down on E Street (to the south of Lots 1 and 2 and to the north of the "B" buildings), which is fairly steep, on one occasion, and on the SSB/GC Walkway on one occasion.

45. Mr. Guerra has a motorized scooter that he received several months before trial from the California Department of Rehabilitation ("DoR") at no cost. Mr. Guerra has not used the scooter yet, on campus or otherwise. He has requested that the DoR pay for the installation of a scooter lift in his vehicle, but that request has not been approved yet. He prefers not to use the scooter to get around campus because he does not use it in other aspects of his life.

46. Mr. Guerra has not utilized either the city bus or the Access paratransit service to get to campus. He testified that taking the city bus to campus would not ameliorate the trouble he has had traversing the Pedestrian Mall because he would still need to walk "uphill" from the bus stop on the SSB/GC Walkway to get to his classes. He has an Access membership and acknowledges that an Access paratransit vehicle would be able to transport both him and his scooter to campus safely, but finds Access to be unreliable because they provide a 45-minute window for pickups rather than a specific time. He also enjoys the flexibility and independence that driving his own vehicle to campus provides.

47. As with Mr. Guerra, prior to the termination of the on-campus shuttle service, Ms. Chrystal would drive herself to campus, park in a handicap space in Lot 5 and call for a ride. A shuttle driver would pick her up at the Lot 5 pick-up location and transport her to the drop-off location closest to the building she had class in. All of her classes thus far

have been in the GC, and she has not yet attempted to access any other buildings. When she was done with class for the day, she would call for a ride and receive a ride back to the Lot 5 drop-off location. Ms. Chrystal found the shuttle service to be convenient, reliable, and safe, particularly when it was operated by the WLAC custodians / paratransit drivers (as compared to the Sheriff's Department cadets).

48. Since the termination of the shuttle service, Ms. Chrystal has continued driving herself to campus. Most recently, she made arrangements with another student whereby she paid for his campus parking pass in exchange for him bringing her from her car (which she parks in one of the campus lots) to the entrance of the SSB/GC Walkway (*i.e.,* near the bus stop) and then back to her car again after class. She is not able to walk the distance between any of the campus parking lots and the buildings in which classes are held.

49. Ms. Chrystal has a manual wheelchair but does not have the upper body strength to operate it. She does not have a motorized wheelchair or scooter. She filled out some application materials to get a DoR-subsidized scooter in the fall of 2016, but has not completed the application process and is now "rethinking" it. Though her doctor does not recommend that Ms. Chrystal use a motorized scooter full time because he is concerned that she will be less active than she already is, he did write a letter to the DoR in support of her application given the lack of on-campus transportation options at WLAC.

50. As with Mr. Guerra, Ms. Chrystal has never utilized the city bus or the Access paratransit service to get to campus. She would have difficulty taking the city bus because she would struggle to carry her books, oxygen tank and other belongings onto the bus. She has an Access membership and has utilized the Access paratransit service for other purposes, such as getting to doctors' appointments, but she has had a "very bad experience with them," including them being late and taking time picking up other riders. She is concerned that she would not be able to get to class on time if she used Access to get to campus.

51.     When Mr. Bontrager first enrolled in WLAC classes in the fall of 2014, he generally walked the approximately one-half mile from his house to campus. Sometimes his mother would give him a ride and sometimes he would take the city bus, but more often than not he walked. The walk from his house to the entrance at the southwest of the campus, at Overland Avenue and Freshman Drive, is mostly flat. Once on campus though, the walk up Albert Vera Drive is steep. He would walk up Albert Vera Drive, then turn left (north) on B Street to access the SSB/GC Walkway and the rest of campus.

52.     Soon after enrolling at WLAC, classmates informed Mr. Bontrager about the on-campus shuttle service and Mr. Bontrager incorporated the shuttle service into his daily routine. When he arrived on campus he would call the shuttle operator and request a pickup from the pickup location at the bottom (the west end) of Albert Vera Drive and would get a ride to the drop-off location closest to his class. Once on campus, he also utilized the shuttle service to get from building to building. When he was done for the day, he would request and receive a ride back to the pickup/drop-off location at the bottom of Albert Vera Drive. As with Mr. Guerra and Ms. Chrystal, Mr. Bontrager found the shuttle service to be convenient, reliable, and safe.

53.     Following the termination of the on-campus shuttle service, Mr. Bontrager resumed walking up Albert Vera Drive to get to his classes. Occasionally his mother gives him a ride or he takes the city bus, but primarily he walks. He becomes tired walking up the steep incline of Albert Vera Drive and is sometimes agitated by the time he gets to class. Most of his classes have been in the GC, but when he needs to access the upper tier of campus he takes the stairs instead of the elevator, because he thinks the elevator is too slow.

54.     Unlike Mr. Guerra or Ms. Chrystal, Mr. Bontrager occasionally takes the city bus to campus. He has a free bus pass (*i.e.,* he can take the bus at no cost) and there is a bus stop close to his house where the bus that goes to campus stops. He also consistently takes the city bus to and from his job at a library (unaffiliated with WLAC), which is further away from his home than campus. He does not feel that taking the bus to campus

consistently is a viable option though because it does not always run on the posted schedule, which means that sometimes he might just miss a bus and/or need to wait for a long time for the next bus.

55.     Mr. Bontrager has not utilized the Access paratransit service to get to campus.  He is familiar with the service because he utilized it in the past to get to classes at a different college he used to attend.  He does not believe that Access is a viable option to get to campus because rides must be scheduled in advance and Access provides a pickup "window" rather than giving riders a specific pickup time.

56.     After the shuttle service was terminated, Plaintiffs and their attorneys had multiple meetings with school officials, including Dr. Duke, the Dean of Support Services at WLAC.  Among other things, Dr. Duke suggested which lots Mr. Guerra and Ms. Chrystal might park in to have the shortest path to certain buildings, and suggested that each of the Plaintiffs might utilize the city bus or the Access paratransit service to get dropped off on B Street near the SSB/GC Walkway.  Each of the Plaintiffs rejected the idea of taking the bus or Access paratransit to campus.   Ms. Chrystal and Mr. Guerra testified that during at least one of these meetings an attorney for WLAC suggested that they may need to use a wheelchair or scooter to get around campus, something neither of them wants to do.  Plaintiffs requested that WLAC reinstate the on-campus shuttle service and those requests were refused.

### F.     Mastin and Kirsch Site Inspections

57.     Jeff Mastin, a licensed architect and "an access expert … in the fields of construction, architecture, and disabled accessibility," was retained by Plaintiffs to inspect the WLAC campus and provide an opinion regarding its accessibility.  Mr. Mastin visited the WLAC campus on at least one occasion and inspected relevant areas of the campus.

58.     Jasper Kirsch, a "senior accessibility consultant" with a firm that works with public and private sector clients to "ensur[e] that buildings, new construction and existing facilities are in compliance with federal and state accessibility codes," was retained by Defendants to inspect the WLAC campus and provide an opinion regarding its

accessibility.  Mr. Kirsch visited the WLAC campus on three occasions and inspected relevant areas of the campus.

59.     Messrs. Mastin and Kirsch agree that the ADA Accessibility Guidelines ("ADA Guidelines") provide for a maximum "running slope" of 5% and a maximum "cross slope" of 2%.  The Court has confirmed that their interpretation of the ADA Guidelines is accurate in this regard.  "'The 'slope' or 'running slope' measures the rise (or fall) of the path in the direction of travel.'"  *Hubbard v. 7-Eleven, Inc.*, 433 F. Supp. 2d 1134, 1146 (S.D. Cal. 2006) (quoting *Parr v. L & L Drive-Inn Restaurant*, 96 F. Supp. 2d 1065, 1087 (D. Haw. 2000); citing ADA Guidelines § 3.5).  "'A one percent slope rises (or falls) at the rate of one foot vertically for every one hundred feet of distance travelled.'"  *Id.* (quoting *Parr*, 96 F. Supp. 2d at 1087).  A path with a running slope of greater than 5% is deemed a "ramp" and must comply with relevant ADA Guidelines provisions regarding ramps, including the need for handrails and the like.  *See id.*  "A 'cross slope' is '[t]he slope that is perpendicular to the direction of travel.'"  *Id.* (quoting *Parr*, 96 F. Supp. 2d at 1087; citing ADA Guidelines § 3.5).  "A cross slope that is too steep can cause a wheelchair occupant to have difficulty steering and, in extreme cases, cause the wheelchair to overturn."  *Id.* (citing *Parr*, 96 F. Supp. 2d at 1087).  "Under the federal law, a cross slope of an accessible route cannot exceed 1:50, or 2%."  *Id.* (quoting *Parr*, 96 F. Supp. 2d at 1087; citing ADA Guidelines § 4.3.7).

60.     Messrs. Mastin and Kirsch also both agree that, while the ADA Guidelines address things such as the distance between handicap parking spaces and buildings (*i.e.,* those spaces must be closer to the building than non-handicap spaces), they are silent on the issue of distance alone.  There is thus no particular distance between buildings or between parking spaces and buildings that is per se unreasonable or that constitutes a per se barrier under the ADA Guidelines.

61.     Mr. Kirsch testified that Albert Vera Drive runs for approximately 1375 feet from Freshman Drive to B Street and is quite steep.  He has no reason to question that

Albert Vera Drive would constitute a barrier to access for these Plaintiffs if they were compelled to traverse it on foot.

62.     Messrs. Mastin and Kirsch took running slope and cross slope measurements on both the SSB/GC Walkway and the Pedestrian Mall.  They are largely in agreement on the pertinent quantifiable aspects of both.

63.     The SSB/GC Walkway runs approximately 80 feet from the bus stop on B Street to the elevator and stairs at the end of the Walkway that link the middle tier with the upper tier.  The cross slope of the SSB/GC Walkway is entirely below 2%.  The running slope of the south side of the SSB/GC Walkway (the side closest to the GC) is less than 5% for the entire 80 feet.  The running slope of the north side of the SSB/GC Walkway is less than 5% for approximately 70 feet, and it is approximately 5.5% for 10 feet.  Messrs. Mastin and Kirsch agree that one can walk from the bus stop to the GC entrance, the SSB entrance, and/or the elevator without ever encountering a running slope that exceeds 5%. Mr. Kirsch described the SBS/GC Walkway as "relatively flat."

64.     The Pedestrian Mall runs approximately 270 feet from the SPS entrance to the FA entrance and approximately 493 feet from the SPS entrance to the HLRC entrance. The running slope of the entire Pedestrian Mall is negligible: Mr. Mastin describes the Pedestrian Mall as a "plateau" and Mr. Kirsch describes it as "flat."  Mr. Mastin testified that he measured cross slopes of between 3.2% and 5.6% next to five storm drains on the path, but that he did not measure cross slopes exceeding the 2% ADA Guidelines threshold elsewhere on the Pedestrian Mall.  Mr. Kirsch similarly testified that he measured cross slopes exceeding 2% only next to storm drains on the west side of the Pedestrian Mall, but that the cross slope on the east side of the Pedestrian Mall is entirely below 2%.

65.     Mr. Mastin did not evaluate the relevant areas of the WLAC campus for accessibility for individuals using wheelchairs or scooters.  Mr. Kirsch testified that he saw no barriers to access for individuals using wheelchairs or scooters.

## II. CONCLUSIONS OF LAW

### A. First Claim: Title II of the ADA

1.      To have a viable claim under Title II of the ADA, a plaintiff must show that: (1) she is an individual with a disability; (2) she is otherwise qualified to participate in or receive the benefit of a public entity's services, programs or activities; (3) she was either excluded from or denied the benefits of the public entity's services, programs or activities or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits or discrimination was by reason of her disability. *See, e.g., Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014); *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014). It is undisputed that Plaintiffs each have a "disability" and that they are each "qualified to participate in or receive the benefit of" WLAC's services, programs or activities, and that WLAC is a "public entity."

2.      Title II requires that public entities "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

3.      The "prohibition against discrimination is universally understood as a requirement to provide 'meaningful access.'" *Lonberg v. City of Riverside*, 571 F.3d 846, 851 (9th Cir. 2009). "An individual is excluded from participation or denied the benefits of a public program if 'a public entity's facilities are inaccessible or unusable by individuals with disabilities.'" *Daubert v. Lindsay Unified School Dist.*, 760 F.3d 982, 987 (9th Cir. 2014) (quoting 28 C.F.R. § 35.149).

4.      "To establish a violation under the ADA or Rehabilitation Act, it is Plaintiffs' burden to show that they have been denied meaningful access to benefits on account of their disability." *G. v. Hawaii*, Nos. 08-00551 ACK-BM, 09-00044 ACK-BM, 2010 WL 3489632, at *16 (D. Haw. Sept. 3, 2010). If Plaintiffs have not been denied "meaningful access," Defendants need not provide them any "reasonable

accommodation." *See Mark H. v. Lemahieu,* 513 F.3d 922, 937 (9th Cir. 2008) ("although § 504 does not require 'substantial adjustments in existing programs beyond those necessary to eliminate discrimination against otherwise qualified individuals,' it, like the ADA, does require reasonable modifications necessary ***to correct for instances in which qualified disabled people are prevented from enjoying 'meaningful access to a benefit because of their disability*.'") (quoting *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 410 (1979)) (emphasis added).

5.    The Court rejects Plaintiffs' argument that the plaintiff-specific "meaningful access" inquiry is divorced from a defendant's compliance or non-compliance with objective ADA Guidelines. As a matter of both law and commonsense, compliance with relevant ADA Guidelines that relate to physical features that a plaintiff claims to constitute a barrier to access undercuts those claims. *See, e.g., Oliver v. Ralph's Grocery Company*, No. 07 CV 2301 JLS (POR), 2009 WL 10680616, at *3 (S.D. Cal. Aug. 26, 2009) ("Well-established precedent confirms that the ADAAG provide the standard for determining whether a defendant has violated the ADA."); *Hubbard*, 433 F. Supp. 2d at 1138 (explaining that the ADA Guidelines "'provide valuable guidance in determining whether an existing facility contains architectural barriers.'") (quoting *Pascuiti v. New York Yankees*, 87 F. Supp. 2d 221, 226 (S.D.N.Y. 1999)).

6.    The Court rejects Plaintiffs' argument that the city bus and Access paratransit services should not be considered in connection with the "meaningful access" inquiry because they are not provided directly by Defendants. There is precedential support for the notion that a public entity may not rely upon the fortuitous assistance of private actors in connection with providing meaningful access to disabled individuals. For example, in *Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189 (2d Cir. 2014), the Second Circuit held that disabled voters were denied meaningful access to their polling locations despite the fact that they "were ultimately able to vote with the fortuitous assistance of others" because "[t]he right to vote should not be contingent upon the happenstance that others are available to help." 752 F.3d at 200. In that case, the

"others" the Second Circuit was referring to were other private citizens who happened to assist these disabled individuals at the voting locations on the occasions in question. *Id.* In *American Council for the Blind v. Paulson*, 525 F.3d 1256 (D.C. Cir. 2008), a case brought by visually impaired citizens against the Treasury Secretary to compel the printing of tactilely-distinguishable currency, the D.C. Circuit held that the fact that plaintiffs might "rely on the assistance of strangers" or "spend substantial sums of money" to purchase equipment that distinguished between different bills did not defeat their lack-of-meaningful-access argument. 525 F.3d at 1270. But there is no precedential support for Plaintiffs' argument that a publicly funded entity such as a community college may not rely upon other well-established publicly funded services, such as a city bus or community paratransit service, to assist in providing meaningful access to its disabled participants. *See Kirola v. City and County of San Francisco,* 860 F.3d 1164, 1183 (9th Cir. 2017) ("The public transportation and paratransit services are the sorts of 'other methods' that can satisfy program access even if other particular methods of benefitting from the program are inaccessible.") (quoting 28 C.F.R. § 35.150(b)(1)). Plaintiffs' argument in this regard is unsupported by the law and is, in the Court's opinion, unsupportable as a matter of policy. To hold that WLAC cannot rely upon the Culver City bus or the Access paratransit service to transport its disabled students from off-campus locations to a point on campus from which all relevant classrooms and services are accessible would be to discourage cooperation between public entities and public transportation service providers and to mandate the inefficient duplication of overlapping transportation efforts.

  7. The Court rejects Plaintiffs' argument that the possibility of Mr. Guerra and Ms. Chrystal utilizing motorized scooters should not be considered in connection with the "meaningful access" inquiry. As confirmed by both Mr. Mastin and Mr. Kirsch, the terrain on both the SBS / GC Walkway and the Pedestrian Mall, from which all relevant WLAC buildings are accessible, is within the applicable ADA Guidelines with respect to both running slope and cross slope – *i.e.*, "relatively flat," as Mr. Kirsch put it. If both

Mr. Guerra and Ms. Chrystal quickly tire and face the real and consistent prospect of falling on such terrain without the aid of a wheelchair or scooter, it suggests that it may not be safe for them to traverse any terrain for more than some minimum distance (several steps for Ms. Chrystal, and perhaps 50 feet for Mr. Guerra, depending on the day) without a wheelchair or scooter, and that the risk is not endemic to WLAC. The facts that the DoR has already provided Mr. Guerra with a scooter and that Ms. Chrystal's doctor saw fit to recommend that the DoR provide her with a scooter supports the notion that perhaps they should be using these devices in any situation in which they must ambulate more than the threshold distance at which they tire and their risk of falling increases. Of course, Mr. Guerra and Ms. Chrystal are free to choose not to use motorized scooters. But neither WLAC nor any other public entity is legally compelled to fill the void with golf cart transportation service as a result of that choice.

8.    With these principles in mind, the Court finds that each of the Plaintiffs has at all relevant times had meaningful access to WLAC's programs and facilities.

9.    Mr. Guerra has a motorized scooter that DoR provided at no cost and is currently working with DoR to have a scooter lift installed in his vehicle. Once that is installed, Mr. Guerra can transport his own scooter to campus, park in the SPS, and access all relevant WLAC buildings via the Pedestrian Mall, the SBS/GC Path, and the elevator linking the two, each of which are accessible for wheelchair and scooter users. Until a scooter lift is installed in his vehicle, Mr. Guerra can travel to and from campus with the Access paratransit service, which is also able to transport his scooter. The paratransit stop is directly south of the bus stop on B Street and close to the SBS/GC Walkway, from which (via the elevator and the Pedestrian Mall) all relevant WLAC facilities are accessible. Even if Mr. Guerra elects not to use his motorized scooter, he can still avoid walking some or all of the distance (depending on which building he is trying to access) on the Pedestrian Mall that he currently travels from the SPS if he utilizes Access paratransit.

10.     Ms. Chrystal is able to get a motorized scooter from DoR at no cost but has not completed the application process.  If and when she obtains a motorized scooter, she will be able to transport it to and from campus in the same ways that Mr. Guerra can transport his scooter to and from campus (either in her own vehicle if she gets a lift, or with Access paratransit) and can access all relevant WLAC facilities via the Pedestrian Mall (if she drives herself and parks in the SPS) or the SBS/GC Walkway (if she utilizes Access paratransit).  Even if she elects not to utilize a motorized scooter, Ms. Chrystal can take Access paratransit and get dropped off near the SBS/GC Walkway (where her classmate dropped her off in exchange for her paying for his parking pass) and access all relevant WLAC facilities from there via relatively flat walkways.

11.     Mr. Bontrager has no difficulty walking long distances over flat surfaces.  He thus has no difficulty traversing either the SBS/GC Walkway or the Pedestrian Mall, and no difficulty accessing any of the relevant WLAC facilities once he is on B Street in front of the SBS/GC Walkway.  But Mr. Bontrager does struggle walking up Albert Vera Drive.  Mr. Bontrager can avoid this by taking the Culver City bus, which he is familiar with, has a free pass for, can access from near his home, and utilizes in other contexts.

12.     The Court rejects Plaintiffs' arguments that the city bus and Access paratransit services are not viable solutions because Plaintiffs find them to be inconvenient or otherwise less than ideal.  These are well established, regularly recurring public transport services.  Though they undoubtedly offer less flexibility than driving oneself or walking, there is no evidence that they do not serve the transportation needs that they were created and are funded to serve.  *See Kirola v. City and County of San Francisco*, 74 F. Supp. 3d, 1187, 1255 (N.D. Cal. 2014), *aff'd in part and rev'd in part on other grounds*, 860 F.3d 1164 (9th Cir. 2017) ("That [plaintiff] may personally dislike [another public swimming pool that is farther away from his home], without more, has no bearing on whether the City is in compliance with its obligation to render its aquatic program accessible for mobility-impaired persons on a program access basis.") (citing *Daubert*, 760 F.3d at 988).

13. In sum, the Court finds that, notwithstanding the termination of the on-campus shuttle service, the WLAC campus remains meaningfully accessible to Plaintiffs. Accordingly, Defendants have not violated Title II of the ADA with respect to Plaintiffs.

## B. Second Claim: Section 504 of the Rehabilitation Act

14. Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" 29 U.S.C. § 794.

15. "'There is no significant difference in the analysis of the rights and obligations created by the ADA and Rehabilitation Act.'" *Kirola*, 74 F. Supp. 3d at 1231 (quoting *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1045 n. 11 (9th Cir. 1999)) (additional citations omitted).

16. In light of Plaintiffs' failure to establish that Defendants have denied them meaningful access to WLAC's relevant programs and facilities in connection with their ADA claim, Plaintiffs have not established that Defendants violated section 504 of the Rehabilitation Act.

## C. Third Claim: California Government Code section 11135

17. Section 11135 of the California Government Code provides that "[n]o person in the State of California shall, on the basis of … physical disability … be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state." Cal. Gov't Code § 11135.

18. Section 11135 "is identical to the Rehabilitation Act except the entity must receive State financial assistance" rather than federal financial assistance. *Y.G. v. Riverside Unified Sch. Dist.*, 774 F. Supp. 2d 1055, 1065 n. 6 (C.D. Cal. 2011). If a plaintiff does not have a viable claim under section 504 of the Rehabilitation Act, he

similarly does not have a viable section 11135 claim. *See id.*; *D.K. ex rel. G.M. v. Solano Cnty. Office of Educ.*, 667 F. Supp. 2d 1184, 1191 (E.D. Cal. 2009).

19. In light of Plaintiffs' failure to establish that Defendants have denied them meaningful access to WLAC's relevant programs and facilities in connection with their ADA and Rehabilitation Act claims, Plaintiffs have not established that Defendants violated section 11135 of the California Government Code.

**D.    Fourth Claim: California Education Code section 66270**

20. Section 66270 of the California Education Code provides that "[n]o person shall be subjected to discrimination on the basis of disability … in any program or activity conducted by any postsecondary educational institution that receives, or benefits from, state financial assistance or enrolls students who receive state student financial aid."  Cal. Educ. Code § 66270.

21. In light of Plaintiffs' failure to establish that Defendants have denied them meaningful access to WLAC's relevant programs and facilities, Plaintiffs have not established that Defendants have discriminated against them on the basis of their disabilities and have therefore not established that Defendants violated section 66270 of the California Education Code.

**E.    Fifth Claim: Unruh Civil Rights Act**

22. "The Unruh Act provides that persons with disabilities have equal access to streets, highways, public places, public conveyances, places of public accommodation, and housing." *Kirola*, 74 F. Supp. 3d at 1232 (citing Cal. Civ. Code §§ 51, 54(a)).  "A violation of the ADA constitutes a violation of the Unruh Act." *Id.* (citing Cal. Civ. Code § 51(f)).  An Unruh Act claim succeeds or fails along with a corresponding ADA claim. *See, e.g., Cohen*, 754 F.3d at 694 (explaining that district court granted defendant's summary judgment motion on Unruh Act claim because it was "based on [plaintiff's] ADA claim").

23.     In light of Plaintiffs' failure to establish that Defendants have denied them meaningful access to WLAC's relevant programs and facilities, Plaintiffs have not established that Defendants violated the Unruh Act.

### F.     Sixth Claim: California Disabled Persons Act

24.     The California Disabled Persons Act provides that "[i]ndividuals with disabilities shall be entitled to full and equal access, as other members of the general public, to … places of public accommodation…"  Cal. Civ. Code § 54.1.  A violation of the ADA constitutes a violation of the Disabled Persons Act and those claims succeed or fail together.  *See Cohen*, 754 F.3d at 694 (explaining that district court granted defendant's motion for summary judgment Disabled Persons Act claim because it was "based on [plaintiff's] ADA claim").

25.     In light of Plaintiffs' failure to establish that Defendants have denied them meaningful access to WLAC's relevant programs and facilities, Plaintiffs have not established that Defendants violated the Disabled Persons Act.

### G.     Seventh Claim: Negligence and Negligence Per Se

26.     The essential elements of a negligence claim are that: (1) the defendant was negligent; (2) the plaintiff was harmed; and (3) the defendant's negligence was a substantial factor in causing plaintiff's harm.  California Civil Jury Instructions ("CACI") 400.  Negligence is the failure to use reasonable care to prevent harm to oneself or to others.  A person can be negligent by acting or failing to act.  A person is negligent if he or she does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation.  CACI 401.

27.     The essential elements of a negligence per se claim are that: (1) the defendant violated some statutory law that sets the applicable standard of care that the defendant must exercise with respect to the plaintiff and other similarly situated people; and (2) that violation was a substantial factor in causing the plaintiff's harm.  *See* CACI 418.

28.     As Plaintiffs acknowledge, as with all of their other claims, a key factual issue for determining Defendants' potential liability in connection with Plaintiffs' negligence and negligence per se claim is "whether, without the provision of the requested transportation assistance, the services, programs, and activities on the WLAC campus are accessible to Plaintiffs…" (Joint Pretrial Order (Docket No. 155) at 13).

29.     In light of Plaintiffs' failure to establish that Defendants have denied them meaningful access to WLAC's relevant programs and facilities, Plaintiffs have not established that Defendants were negligent in their failure or refusal to provide Plaintiffs with on-campus shuttle services.

### III. <u>VERDICT</u>

The Court finds and rules as follows:

1. On Plaintiffs' First Claim that Defendants violated Title II of the ADA, the Court finds in favor of Defendants.

2. On Plaintiffs' Second Claim that Defendants violated section 504 of the Rehabilitation Act, the Court finds in favor of Defendants.

3. On Plaintiffs' Third Claim that Defendants violated section 11135 of the California Government Code, the Court finds in favor of Defendants.

4. On Plaintiff's Fourth Claim that Defendants violated section 66270 of the California Education Code, the Court finds in favor of Defendants.

5. On Plaintiffs' Fifth Claim that Defendants violated the Unruh Civil Rights Act, the Court finds in favor of Defendants.

6. On Plaintiffs' Sixth Claim that Defendants violated the California Disabled Persons Act, the Court finds in favor of Defendants.

7. On Plaintiffs' Seventh Claim that Defendants were negligent and negligent per se with respect to Plaintiff Guerra, the Court finds in favor of Defendants.

///
///
///

The Court will enter a separate judgment pursuant to Federal Rules of Civil Procedure 54 and 58(b).

Dated:  August 20, 2018

_____
MICHAEL W. FITZGERALD
United States District Judge